Argued and submitted March 31, judgment of circuit court affirmed in part and
reversed in part June 25, 1998

Judith D. ARMATTA;
Sheriff Stan Robson; Sidney I. Lezak;
Stephen Kanter; Jean Tate;
Kathleen Hagberg; and Linda Eyerman,
*Appellants / Cross-Respondents,*

*v.*

John KITZHABER,
Governor of the State of Oregon;
Phil Keisling, Secretary of State;
and the State of Oregon,
*Respondents / Cross-Appellants.*

(CC 96C-14060; CA A96736; SC S44995)

959 P2d 49

Thomas M. Christ, ACLU Foundation of Oregon, Inc., Portland, argued the cause for appellants/cross-respondents. With him on the briefs were Carl R. Neil and Katherine A. McDowell, ACLU Foundation of Oregon, Inc., Portland.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause for respondents/cross-appellants. On the briefs were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Rives Kistler, Assistant Attorney General, Salem.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, Kulongoski, and Leeson, Justices.[**]

CARSON, C. J.

Durham, J., concurred and filed an opinion.

---

[**] Graber, J., resigned March 31, 1998, and did not participate in this decision.

**CARSON, C. J.**

This is a certified appeal involving a direct challenge to the constitutionality of Ballot Measure 40 (1996),[1] a "crime victims' rights" initiative that was approved by the voters at the 1996 general election. The circuit court enjoined defendants Kitzhaber and the State of Oregon (collectively referred to herein as "the state") from enforcing section (2) of Measure 40, after concluding that that section revised, rather than amended, the Oregon Constitution. The state appealed to the Court of Appeals, which certified the appeal to this court.

■ As this case is presented to us, the merits of the various policy choices represented by Measure 40 are not at issue. The only question is whether the measure was adopted validly. For the reasons that follow, we conclude that, although it purported to be a single amendment to the Oregon Constitution, Measure 40 contains two or more constitutional amendments that must be voted upon separately under Article XVII, section 1, of that document. We therefore hold that, because the measure does not comply with the requirements for adopting a constitutional amendment, it is invalid in its entirety. We modify the judgment of the circuit court accordingly.

## I. PROCEDURAL BACKGROUND

Shortly after the 1996 general election, plaintiffs filed the present action under ORS 28.010 (1995) for declaratory and injunctive relief, seeking a ruling that Measure 40 was unconstitutional. Specifically, plaintiffs contended that Measure 40 violated the Oregon Constitution in three respects: (1) it contained two or more amendments, in violation of Article XVII, section 1; (2) it embraced more than one subject, in violation of Article IV, section 1(2)(d); and (3) it revised, rather than amended, the Oregon Constitution, which, under Article XVII, section 2, cannot be accomplished by initiative petition. Plaintiffs further sought a declaration that defendant Keisling, Secretary of State, violated the law

---

[1] The text of Measure 40 is attached as an appendix to this opinion. Measure 40 currently is listed as Article I, section 42, of the Oregon Constitution.

by placing Measure 40 on the ballot and that defendant Kitzhaber, Governor of Oregon, violated the law by proclaiming the adoption of the measure. Finally, plaintiffs sought an injunction prohibiting the State of Oregon from enforcing Measure 40. The state filed an answer, and both sides moved for summary judgment.

In a letter opinion issued on February 5, 1997, the circuit court concluded that section (2) of Measure 40 revised the Oregon Constitution, but that the section was severable. Accordingly, the court severed section (2) and left the rest of the measure intact. On February 19, 1997, the court entered an order and a judgment consistent with its letter ruling as to the validity of Measure 40. The judgment enjoined "[d]efendant Kitzhaber and his subordinates and the State and its subdivisions" from "enforcing or attempting to enforce section 2 of Ballot Measure 40." The judgment concluded, however, that defendant Kitzhaber did not violate the law when he proclaimed the adoption of Measure 40. Finally, the judgment concluded that plaintiffs' claims against defendant Keisling were time-barred and, accordingly, dismissed him as a defendant.[2] In June 1997, the court entered a supplemental judgment awarding plaintiffs attorney fees in the amount of $23,677.50.

Plaintiffs appealed to the Court of Appeals, contending that the circuit court erred in concluding that section (2) was severable from the rest of Measure 40 and also erred in rejecting their other substantive challenges to the measure. The state cross-appealed, contending that the circuit court erred in concluding that section (2) revised the constitution. The state further contended that the court erroneously entered an injunction against defendant Kitzhaber and the State of Oregon, and that it erroneously awarded attorney fees to plaintiffs. Shortly thereafter, the state moved to stay or modify the circuit court's injunction concerning the enforcement of section (2) of Measure 40. The Court of Appeals stayed the injunction in August 1997, pending the outcome on appeal. *Armatta v. Kitzhaber*, 149 Or App 498, 943 P2d 634 (1997).

---

[2] Plaintiffs do not challenge the dismissal of defendant Keisling.

In early 1998, in response to plaintiffs' motion pursuant to ORS 19.405(1) (1997), the Court of Appeals certified the appeal, and this court accepted it. ORS 19.405(2) (1997).

## II. OVERVIEW OF MEASURE 40

Measure 40 was submitted to the voters as an initiated amendment to Article I of the Oregon Constitution. According to its preamble, Measure 40 "is designed to preserve and protect **crime victims' rights** to justice and due process and to ensure the prosecution and conviction of persons who have committed criminal acts." (Boldface in original.)

The measure contains nine sections. Section (1) lists the following rights to which victims of crime are entitled in all criminal prosecutions and juvenile delinquency proceedings: (1) rights relating to pretrial detention and release of criminal defendants; (2) the right to be notified of certain stages of criminal proceedings and the right to be present and heard; (3) the right to information about the conviction, sentencing, imprisonment, criminal history, and future release of criminal defendants; (4) the right to refuse to participate in criminal defendants' discovery requests; (5) the right to receive prompt restitution; (6) the right to have all relevant evidence admitted against criminal defendants; (7) the right to have criminal defendants tried by a jury composed of jurors who are registered voters and who have not been convicted of a felony or served a felony sentence within the last 15 years; (8) the right to have criminal defendants convicted by a jury vote of 11 to 1 in aggravated murder and murder cases; (9) the right to receive prepared copies of court transcripts; (10) the right to have criminal defendants serve their sentences in full, without such sentences being set aside, except through the governor's reprieve, commutation, or pardon power, or pursuant to appellate or post-conviction relief; (11) the right to have convicted criminals sentenced consecutively for crimes against different victims; (12) the right to joinder of charges against criminal defendants; (13) the right to be consulted during plea negotiations in certain cases; and (14) the right to notification of the foregoing rights as soon as reasonably practicable. Measure 40, §§ (1)(a) to (n).

Section (2) of Measure 40 declares that the rights set out in the measure "shall be limited only to the extent required by the United States Constitution," that Article I, sections 9 and 12, of the Oregon Constitution, "shall not be construed more broadly than the United States Constitution," and that, in cases involving victims, "the validity of prior convictions shall not be litigated except to the extent required by the United States Constitution." Section (3) provides that the measure "shall not reduce a criminal defendant's rights under the United States Constitution, reduce any existing right of the press, or affect any existing statutory rule relating to privilege or hearsay."

Section (4) of Measure 40 declares that the decision to initiate criminal prosecutions or juvenile delinquency proceedings rests with the district attorney and gives the district attorney the authority to assert the rights conferred upon victims in the measure. Sections (5) to (8) define the terms "victim" and "relevant evidence" for purposes of Measure 40, and clarify various matters relating to the rights conferred in the measure. Finally, section (9) states that Measure 40 creates no new civil liabilities.

## III. CONSTITUTIONAL CHALLENGES TO MEASURE 40

Because it is dispositive, we first address plaintiffs' contention that Measure 40 contains two or more amendments, which must be voted upon separately under Article XVII, section 1, of the Oregon Constitution.

The people's power to amend the constitution through initiative petition arises under Article IV, section 1, of the Oregon Constitution. In addition, Article XVII, section 1, sets out procedural requirements that apply if the legislature proposes constitutional amendments, as well as other requirements that apply to amendments submitted to the voters by legislative proposal or initiative petition. One of those requirements is that "two or more amendments" must be submitted "separately" to the voters.[3]

---

[3] We refer to that provision as the "separate-vote" requirement throughout this opinion. The relevant constitutional provisions are set out in the text below.

Plaintiffs contend that, despite the fact that it was presented to the voters in the *form* of a single constitutional amendment, Measure 40 actually contains "two or more amendments" that the voters must vote upon separately under Article XVII, section 1. The state responds that the separate-vote requirement applies to only *legislatively proposed* constitutional amendments, not to amendments proposed by initiative. Alternatively, the state contends that Measure 40 contains only one amendment, in compliance with the separate-vote requirement.

A. *Application of the Separate-Vote Requirement to Initiated Amendments*

■     We first address the state's contention that the separate-vote requirement of Article XVII, section 1, applies to only amendments proposed by the legislature. In doing so, we must consider the specific wording of Article XVII, section 1, the historical circumstances that led to its creation, and the case law surrounding it. *See Priest v. Pearce,* 314 Or 411, 415-16, 840 P2d 65 (1992) (setting out construction methodology).[4]

Article XVII, section 1, provides, in part:

"Any amendment or amendments to this Constitution may be proposed in either branch of the legislative assembly, and if the same shall be agreed to by a majority of all the members elected to each of the two houses, such proposed amendment or amendments shall * * * be * * * referred by the secretary of state to the people for their approval or rejection * * *. If a majority of the electors voting on any such amendment shall vote in favor thereof, it shall thereby become a part of this Constitution. *The votes for and against such amendment, or amendments, severally, whether proposed by the legislative assembly or by initiative petition,* shall be canvassed by the secretary of state in the

---

[4] We note that certain parts of Article XVII, section 1, themselves were adopted by the people pursuant to their initiative power. *See* 327 Or at 260 (discussing the 1906 amendment to Article XVII, section 1). Our methodology for interpreting a constitutional provision adopted by initiative is to examine the text and context of the provision, in order to discern the voters' intent. If the voters' intent is not clear from an analysis of text and context, we also examine the history of the provision. *Ecumenical Ministries v. Oregon State Lottery Comm.,* 318 Or 551, 559, 871 P2d 106 (1994).

presence of the governor, and if it shall appear to the governor that the majority of the votes cast at said election *on said amendment, or amendments, severally,* are cast in favor thereof, it shall be his duty forthwith * * * *to declare the said amendment, or amendments, severally * * * to have been adopted by the people of Oregon as part of the Constitution thereof,* and the same shall be in effect as a part of the Constitution from the date of such proclamation. *When two or more amendments shall be submitted in the manner aforesaid to the voters of this state at the same election, they shall be so submitted that each amendment shall be voted on separately.* * * * This article shall not be construed to impair the right of the people to amend this Constitution by vote upon an initiative petition therefor." (Emphasis added.)

Article XVII, section 1, prescribes the procedure for the legislature to propose constitutional amendments, as well as other requirements relating to amendment of the constitution. For purposes of our analysis in this case, the most significant requirement is that, if "two or more amendments" are submitted at the same election, they must be "so submitted that each amendment shall be voted on separately."

As noted, the state contends that the separate-vote requirement applies to only amendments proposed by the legislature, not to amendments initiated by the people. In the state's view, Article XVII, section 1, as relevant here, can be analyzed as three distinct parts: (1) the first two sentences, which set out voting and referral procedures for legislatively proposed amendments; (2) the third sentence, which sets out the procedure for canvassing votes on a proposed amendment, "whether proposed by the legislative assembly or by initiative petition"; and (3) the fourth sentence, which imposes the separate-vote requirement "[w]hen two or more amendments shall be *submitted in the manner aforesaid.*" (Emphasis added.) The state contends that the words "submitted in the manner aforesaid" refer to only the first part of Article XVII, section 1, which sets out voting and referral procedures for legislatively proposed amendments (*i.e.,* the "manner" in which such amendments are "submitted").

We disagree with that parsing of the text of Article XVII, section 1. First, the separate-vote requirement appears

*after* the reference in the third sentence to amendments "proposed by the legislative assembly *or* by initiative petition." (Emphasis added.) That placement of the separate-vote requirement suggests that the requirement applies both to amendments proposed by the legislature *and* those proposed by initiative. Additionally, the third sentence of Article XVII, section 1, which pertains to canvassing of votes, refers to "[t]he votes for and against *such* amendment, or amendments, *severally*," proposed by *either* the legislature or initiative petition. (Emphasis added.) That wording is significant for two reasons. First, by referring to "such" amendment or amendments proposed *in either manner*, immediately after stating the procedure for referring legislatively proposed amendments, the third sentence appears to incorporate the procedures for submitting constitutional amendments by initiative petition, set out in Article IV, section 1. Second, by repeatedly using the word "severally," the third sentence emphasizes that the voters must vote upon and adopt two or more amendments separately, regardless of the manner of their proposal.

As contextual support for its reading of Article XVII, section 1, the state points to Article IV, section 1(4)(b), which provides that "[i]nitiative and referendum measures shall be submitted to the people as provided in this section and by law not inconsistent therewith." The state reads that provision as clarifying that Article IV, section 1—not Article XVII, section 1—governs the method for submitting amendments proposed by initiative petition.

However, the text of Article IV, section 1(4)(b), cuts against the state's argument. Significantly, that section provides that initiated amendments must be submitted in accordance with Article IV, section 1, *"and by law not inconsistent therewith."* (Emphasis added.) Thus, Article IV, section 1(4)(b), itself acknowledges that certain requirements *in addition* to those set out in Article IV, section 1—such as the separate-vote requirement of Article XVII, section 1—also govern the submission of initiated amendments. Another part of Article IV—section 1(4)(d)—illustrates that point. That section specifically provides that initiated laws and amendments shall become effective 30 days after their approval, "[n]*otwithstanding section 1, Article XVII of this*

*Constitution.*" (Emphasis added.) That phrase would be surplusage if the requirements contained in Article XVII, section 1, were inapplicable to initiated amendments. Further, it is significant that nothing in Article IV, section 1, similarly insulates initiated amendments from the separate-vote requirement of Article XVII, section 1.

In sum, the specific wording of Article XVII, section 1, as well as the context provided by parts of Article IV, section 1, suggest that Article XVII, section 1, incorporates the procedures for submitting amendments proposed by initiative. The text and context further suggest that, with the exception of specific procedures for legislatively proposed amendments, Article XVII, section 1, applies to amendments "proposed by the legislative assembly or by initiative petition," *unless* Article IV, section 1, specifically provides otherwise.

The historical development of Article XVII, section 1, and Article IV, section 1, as relevant here, supports that conclusion. When the Oregon Constitution went into effect in 1859, Article XVII provided the only method for changing the constitution—by legislative proposal. The original version of Article XVII included a separate-vote requirement that is worded similarly to the current version of that requirement now contained in Article XVII, section 1. *See* 327 Or at 263-64 (setting out text of 1859 version of Article XVII).

In 1902, Article IV, section 1, was amended to grant the people the initiative and referendum power, including the ability to propose constitutional amendments by initiative petition. At that time, Article IV, section 1, provided that "[p]etitions and orders for the initiative * * * shall be filed with the secretary of state, *and in submitting the same to the people he, and all other officers, shall be guided by the general laws* and the act submitting this amendment, until legislation shall be especially provided therefor." Or Const, Art IV, § 1 (1902) (emphasis added). Thus, since the creation of the initiative and referendum power in 1902, Article IV, section 1, has provided that submission of such measures shall be guided both by Article IV, section 1, *and* other applicable laws, presumably including Article XVII, section 1.

In 1906, Article XVII was amended, pursuant to the people's initiative power, to implement the new initiative and referendum process. The amended version is the same as the current version of Article XVII, section 1. Or Const, Art XVII, § 1 (1906). The 1906 amendment added what is now the third sentence of Article XVII, section 1, pertaining to the canvassing of votes, including the reference to "amendments * * * proposed by the legislative assembly or by initiative petition." The new third sentence contained three references to an "amendment or amendments, *severally*." (Emphasis added.) The 1906 amendment also reworded the separate-vote requirement, albeit not materially, and incorporated it into section 1, thereby replacing sections 1 and 2 with a new version of section 1.

The 1906 amendment to the text of Article XVII is instructive for our purposes here in two ways. First, by specifically incorporating references to the people's recently acquired initiative power, it appears that the voters intended the requirements contained in Article XVII, which originally pertained to only legislatively proposed amendments, to apply to initiated amendments as well. Second, by repeatedly including the phrase "amendment or amendments, severally," the 1906 amendment emphasized that "two or more amendments" must remain separate from one another, regardless of the manner of their proposal.[5]

Finally, in 1968, the people adopted a new version of Article IV, section 1, pursuant to legislative proposal. The new version included the current wording of Article IV, section 1(4)(b), that initiated measures must be submitted "as provided in this section and by law not inconsistent therewith." Or Const, Art IV, § 1(4)(b) (1968). That wording is similar to the earlier requirement in Article IV, section 1, that submission of initiated amendments must be guided by the "general laws," as well as by Article IV, section 1. As noted,

---

[5] The voters' pamphlet for the 1906 election did not contain any statements by supporters or opponents concerning their understanding of the scope of the amendment to Article XVII, including the application of the separate-vote requirement to initiated amendments. *See Ecumenical Ministries*, 318 Or at 560 n 8 (history of initiated amendment includes arguments for and against amendment printed in voters' pamphlet).

that wording suggests that the provisions of Article XVII, section 1, including the separate-vote requirement, apply to initiated amendments, *unless* Article IV, section 1, dictates otherwise.

Turning to the applicable case law, we note that only one case, *Baum v. Newbry et al.*, 200 Or 576, 267 P2d 220 (1954), has attempted to address whether the separate-vote requirement applies to amendments proposed by initiative petition. However, in *Baum,* the court assumed, without deciding, that the separate-vote requirement applied to initiated constitutional amendments. 200 Or at 581. *Baum,* therefore, is not helpful to our analysis here.

In sum, the specific wording and historical development of Article XVII, section 1, as well as the context provided by parts of Article IV, section 1, indicate that Article XVII, section 1, incorporates by implication the procedures for submitting constitutional amendments by initiative petition. Additionally, since 1902, Article IV, section 1, itself has provided in some form that the submission of initiated amendments shall be governed by applicable laws not inconsistent with Article IV, section 1. Nothing about the separate-vote requirement of Article XVII, section 1, is inconsistent with any provision of Article IV, section 1. Accordingly, we conclude that the separate-vote requirement applies to constitutional amendments proposed by initiative, as well as those proposed by the legislature.

B. *Interpretation of the Separate-Vote Requirement*

■        Having concluded that the separate-vote requirement applies to initiated constitutional amendments, we turn to plaintiffs' contention that Measure 40 contains two or more amendments in violation of that requirement. In response to plaintiffs' challenge, the state contends that the scope of the separate-vote requirement of Article XVII, section 1, is defined by Article IV, section 1(2)(d), which requires merely that a constitutional amendment embrace "one subject only." If a proposed amendment embraces a single subject under Article IV, section 1(2)(d), the state argues, it necessarily constitutes a single amendment, rather than multiple amendments, under Article XVII, section 1. In the state's view, Measure 40 embraces a single subject—either

crime victims' rights or, more broadly, crime—and, therefore, constitutes only a single amendment to the constitution.

The parties' respective positions require us to examine both the meaning of the separate-vote requirement of Article XVII, section 1, and the relationship, if any, between that requirement and the single-subject requirement of Article IV, section 1(2)(d). In doing so, we emphasize that, when interpreting the Oregon Constitution, we must assume "that every word, clause and sentence therein have been inserted for some useful purpose." *School Dist. 1, Mult. Co. v. Bingham et al*, 204 Or 601, 611, 283 P2d 670, *modified on rehearing* 284 P2d 779 (1955); *see also State ex rel. Gladden v. Lonergan*, 201 Or 163, 177, 269 P2d 491 (1954) ("An elementary rule of construction is that[,] if possible, effect should be given to every part and every word of a Constitution and that unless there is some clear reason to the contrary, no portion of the fundamental law should be treated as superfluous." (Internal quotation marks omitted.)). Thus, because we are concerned here with two requirements that are worded differently and are located in different parts of the Oregon Constitution, we must assume that they have different meanings and that neither requirement is superfluous. In conducting our inquiry into those meanings, we are guided by the construction methodologies set out in *Priest*, 314 Or at 415-16, and *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 559, 871 P2d 106 (1994). *See* 327 Or at 256 and n 4 (setting out methodologies).

1. *The specific wording, historical development, and case law surrounding Article XVII, section 1*

We begin by examining the specific wording of Article XVII, section 1, which, as noted, prescribes the procedure for amending the constitution by legislative proposal, as well as setting out requirements for amendment by legislative proposal or initiative petition. The separate-vote requirement of Article XVII, section 1, provides:

"When two or more amendments shall be submitted in the manner aforesaid to the voters of this state at the same election, they shall be so submitted that each amendment shall be voted on separately."

Although Article XVII, section 1, does not define what is meant by "two or more amendments," it is important to note that the text focuses upon the potential *change* to the existing constitution, by requiring that two or more *constitutional amendments* be voted upon separately. Additionally, as a textual matter, the words "shall be submitted *in the manner aforesaid* to the voters" (emphasis added) could speak to the *form* that a proposed amendment must take as it passes through the legislative or initiative process, up to the time of its submission to the people. That particular text establishes, at a minimum, that the separate-vote requirement prevents the combining of several proposed amendments, which have been labeled from their inception as separate amendments, into one proposed amendment subject to a single vote. That is, all proposed amendments must be submitted to the voters in the same form in which they passed the legislature or were circulated by initiative petition.[6] However, it is not clear from the text that that construction is *all* that is meant by the separate-vote requirement. We now turn to the historical circumstances surrounding the development of Article XVII, section 1.

As noted earlier, when the Oregon Constitution went into effect in 1859, Article XVII provided the only method for amending the constitution:

"SECTION NO. 1

"*Any amendment, or amendments to this Constitution may be proposed in either branch of the Legislative Assembly*, and if the same shall be agreed to by a majority of all the members elected to each of the two Houses such proposed amendment, or amendments shall with the ayes, and nays thereon, be entered on their Journals, and referred to the Legislative Assembly to be chosen at the next general election; and if, in the Legislative Assembly so next chosen, such proposed amendment, or amendments, shall be agreed to, by a majority of all the members elected to each House,

---

[6] To illustrate, suppose that the legislature passed resolutions A, B, and C, all purporting to amend the constitution in some way. Under Article XVII, section 1, the legislature must submit the three resolutions to the voters as three separate proposed amendments (A, B, and C), subject to separate votes, and may not combine them as a single proposed amendment (ABC) that is subject to a single vote.

then it shall be the duty of the Legislative Assembly to submit such amendment, or amendments to the electors of the State, and cause the same to be published without delay, at least four consecutive weeks, in several newspapers published in this State, and if a majority of said electors shall ratify the same, such amendment, or amendments, shall become a part of this Constitution.

"SECTION NO. 2

*"If two or more amendments shall be submitted in such manner, that the electors shall vote for, or against each of such amendments separately*; and while an amendment or amendments, which shall have been agreed upon by one Legislative Assembly, shall be awaiting the action of a Legislative Assembly, or of the electors, no additional amendment, or amendments shall be proposed." Or Const, Art XVII (1859) (emphasis added).

Thus, Article XVII, section 1, originally provided for amendment only if a majority of the members of both houses of two successive legislatures voted to submit an amendment to the people and a majority of the voters then approved it. Article XVII, section 2, also contained a separate-vote requirement that is similar to the wording that now appears in Article XVII, section 1. We have found no history concerning the specific intent of the framers of the Oregon Constitution in respect of that requirement when they adopted Article XVII.

The genesis of the provision is instructive, however. Article XVII of the Oregon Constitution of 1859 was based upon Article XVI of the Indiana Constitution of 1851, which was drafted during a constitutional convention held in that state in 1850. *See* Charles Henry Carey, ed., *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857*, 481 (1926) (Article XVII is identical to Article XVI of the Indiana Constitution of 1851 in all material respects). We have found no Indiana decision antedating adoption of the Oregon Constitution that might have influenced the Oregon framers' intent regarding the separate-vote requirement. *See Priest*, 314 Or at 418 (suggesting that a decision from Indiana courts interpreting a provision of the Indiana Constitution subsequently incorporated in the

Oregon Constitution would be instructive in interpreting the Oregon provision).

Although it is not as helpful as history or case law revealing the intent of the framers of the Oregon Constitution, information that demonstrates the intent of the framers of the Indiana Constitution of 1851 can be instructive when interpreting a provision of the Oregon Constitution patterned after the Indiana Constitution. *See Hale v. Port of Portland*, 308 Or 508, 516, 783 P2d 506 (1989) (so suggesting). The debates from the Indiana convention of 1850 thus may assist our analysis here, to some extent. We turn to an examination of those debates.

Before 1851, the only method of changing the Indiana Constitution in any respect was by calling a constitutional convention. Ind Const, Art VIII, § 1 (1816). A new article was drafted during the 1850 convention that allowed the legislature to propose amendments to the people. In proposing that new article, its drafter stated:

> "[S]uppose such a provision had been contained in the present Constitution, the State would not have been under the necessity of expending some eighty thousand dollars in the calling of this Convention. There were but few of its provisions that required amendment, and those amendments could have been easily made by the Legislature with the approbation of the people, they having the opportunity to accept or reject the proposed amendments. * * * *If there should be a change of popular sentiment in relation to the establishment of a State bank, or in relation to the negro question, or in relation to the rights of married women, and a change should be desired in any provision that we shall make in reference to any of those subjects*, instead of calling a Convention * * *, the amendments could be made without burthening the people with any expense whatever." H. Fowler, 2 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana*, 1258-59 (1850) (hereafter *"Debates and Proceedings"*) (statement of James G. Read) (emphasis added).

That statement suggests that the new amendment procedure, among other things, was intended to address particular, specific changes to the constitution. That is, a single "amendment," such as one concerning the establishment of a

state bank or the rights of married women, was intended to encompass a particular constitutional change.

The convention eventually adopted Article XVI of the Indiana Constitution of 1851. Section 2 of that article incorporated virtually the same separate-vote requirement as that contained in the Oregon Constitution of 1859, as well as a prohibition against proposing new amendments while others were pending approval. Ind Const, Art XVI, § 2 (1851). The convention debates indicate that the purpose of the prohibition was to avoid voter confusion. Fowler, 2 *Debates and Proceedings* at 1953. The debates do not reveal the delegates' intent as to the separate-vote requirement, however.

Thus, although the debates from the Indiana constitutional convention do not reveal clearly the drafters' intent when they created the separate-vote requirement, the debates do indicate that the delegates viewed the amendment process as a means of adopting *particular* constitutional changes. Having exhausted our review of the Indiana history, we return to the historical development of Article XVII of the Oregon Constitution.

In 1902, a majority of the people voted to amend Article IV, section 1, of the Oregon Constitution, in response to a proposal by the Oregon Legislative Assembly, to reserve to the people the right to initiate laws and constitutional amendments. Or Const, Art IV, § 1 (1902). In 1906, the people amended Article XVII, pursuant to their initiative power, making changes to implement the new initiative process. The amended version is the same as the current version of Article XVII, section 1, described previously. Or Const, Art XVII, § 1 (1906). *See also* 327 Or at 260 (discussing the 1906 amendment). For our purposes here, it is significant that the 1906 amendment repeatedly inserted the phrase "amendment or amendments, severally," into Article XVII, section 1, in relation to amendments proposed by the legislature or by initiative petition. Thus, as discussed earlier, the text of the 1906 amendment emphasized that separate amendments must remain separate and distinct from one another. The voters' pamphlet for the 1906 election contained no statements reflecting either supporters' or opponents' understanding of

the amendment to Article XVII, perhaps because the foregoing proposition did not appear to require explanation.

In summary, there is no historical information that specifically illuminates the intent of the framers of the Oregon Constitution when they adopted the separate-vote requirement of Article XVII, section 1. However, the debates from the Indiana convention of 1850 suggest that a constitutional "amendment" was intended by the framers of the Indiana Constitution of 1851 to address a *particular* constitutional change, and we have found nothing to suggest that the framers of the Oregon Constitution had a different understanding or intent.

We turn to the applicable case law interpreting the separate-vote requirement of Article XVII, section 1, of the Oregon Constitution. The first case applying that requirement is *State v. Osbourne*, 153 Or 484, 57 P2d 1083 (1936), which involved a challenge to a legislatively proposed amendment that provided that 10 members of a circuit court jury could render a guilty or not-guilty verdict, except in first-degree murder cases. The *Osbourne* court concluded, without analysis, that the separate-vote requirement was not implicated "because only one amendment was submitted at the election." 153 Or at 486. It is not clear from *Osbourne* whether the court thought that two different amendments labeled as such must be submitted to implicate the separate-vote requirement, or whether the court merely concluded that the amendment at issue constituted only one amendment.[7]

Next, in *State of Oregon v. Payne*, 195 Or 624, 635, 244 P2d 1025 (1952), the court similarly held that a legislatively proposed amendment that reinstated the death penalty did not contravene the separate-vote requirement, "because only one amendment was submitted to the voters." Like *Osbourne*, the court's reasoning in *Payne* is not clear. However, the briefs submitted in *Payne* clarify the parties'

---

[7] The court's opinion and the parties' briefs in *Osbourne* reveal that the true dispute was whether the *ballot title* for the proposed amendment led the voters to conclude that two or more amendments were being submitted. *See Osbourne*, 153 Or at 486-88 (so demonstrating); Appellant's Brief, 1082 Oregon Briefs 1, 26-43 (1936) (same); Respondent's Brief, 1082 Oregon Briefs at 22-25 (same).

understanding of the separate-vote requirement. The defendant had contended that the amendment at issue, although it was submitted as one amendment, actually contained two or three constitutional amendments that the voters must vote upon separately. Appellant's Brief, Oregon Briefs (unbound), No 0-72, 40-43 (1952). The state responded that the separate-vote requirement required only that a proposed amendment could not have different objects and purposes in view. Respondent's Brief, Oregon Briefs (unbound), No 0-72 at 39-40. Thus, both parties in *Payne* read the separate-vote requirement as imposing a substantive limitation upon the ability to propose constitutional amendments. The parties differed, however, concerning the scope of that requirement.

The court in *Payne* did note that the amendment at issue contained two different sections and repealed a constitutional provision that effectively contained two sections, "although not separately numbered." 195 Or at 635. Thus, under *Payne*, the fact that a proposed constitutional amendment contains more than one section does not preclude its submission as a single amendment. However, the court's conclusory statement that "only one amendment was submitted" appears, when read in the context of the parties' competing contentions, to indicate that the court was ruling that the constitutional change at issue there was *substantively*, rather than *numerically*, one amendment.

Finally, in *Baum*, 200 Or 576, the court addressed the question whether an initiated amendment to Article IV, section 6, which concerned reapportionment of the legislative assembly, constituted a single amendment. After assuming, without deciding, that the separate-vote requirement applied to constitutional amendments submitted by initiative petition, the court briefly stated:

> "[The separate-vote requirement] does not prohibit the people from adopting an amendment which would affect more than one article or section by implication. * * * *At most it prohibits the submission of two amendments on two different subjects in such manner as to make it impossible for the voters to express their will as to each.* The fact, if it be one, that the reapportionment amendment may have amended more than one section of the constitution, would be immaterial." *Id.* at 581 (emphasis added).

*Baum* stands for the following principles. First, it demonstrates that the purpose of the separate-vote requirement is to allow the voters to decide upon separate constitutional changes separately. Stated differently, Article XVII, section 1, imposes a requirement aimed at ensuring that the voters are able to express their will in one vote as to only one constitutional change. That is consistent with our textual analysis of the separate-vote requirement, which noted that the requirement focuses upon the nature of the change to the existing constitution, as well as the procedural form that an amendment takes when it is submitted to the people. Second, *Baum* demonstrates that, by implication, a single constitutional amendment may affect one or more constitutional provisions without offending the separate-vote requirement. Finally, *Baum* suggests that the separate-vote requirement encompasses, to some extent, the notion that a single amendment must contain a single "subject."

2. *The specific wording, historical development, and case law surrounding Article IV, section 1(2)(d)*

As noted earlier, the state contends in this case that the separate-vote requirement of Article XVII, section 1, imposes the same limitation upon the people's ability to amend the constitution as the single-subject requirement of Article IV, section 1(2)(d). Therefore, we must examine the single-subject requirement and its relationship, if any, to the separate-vote requirement.

Article IV, section 1, of the Oregon Constitution, provides, in part:

"(1) The legislative power of the state, *except for the initiative and referendum powers reserved to the people*, is vested in a Legislative Assembly, consisting of a Senate and a House of Representatives.

"(2)(a) *The people reserve to themselves the initiative power, which is to propose laws and amendments to the Constitution and enact or reject them at an election independently of the Legislative Assembly.*

"* * * * *

"(c)  An initiative amendment to the Constitution may be proposed only by a petition signed by a number of qualified voters equal to eight percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition.

"(d)  An initiative petition shall include the full text of the proposed law or amendment to the Constitution. *A proposed law or amendment to the Constitution shall embrace one subject only and matters properly connected therewith.*

"(e)  An initiative petition shall be filed not less than four months before the election at which the proposed law or amendment to the Constitution is to be voted upon." (Emphasis added.)

Article IV, section 1(2), reserves to the people the power to enact laws and adopt amendments to the constitution by initiative petition. Like Article XVII, section 1, Article IV, section 1(2), does not define the word "amendment." The principal substantive restriction set out in Article IV, section 1(2), is that a proposed amendment must "embrace one subject only and matters properly connected therewith." Unlike the text of the separate-vote requirement, that requirement focuses upon the *content* of the proposed amendment, by requiring that it *embrace* only a single subject. In other words, the single-subject requirement of Article IV, section 1(2)(d), concerns only the *text* of the proposed amendment viewed in isolation, rather than how a proposed amendment might *change* the existing constitution.

In order to fully understand the interplay between the separate-vote and single-subject requirements, it is helpful to determine whether the single-subject requirement pertains to only amendments proposed by initiative, or also to amendments proposed by the legislature under Article XVII, section 1. The answer is not clear from the text of Article IV, section 1(2)(d). However, when viewed in context with the first sentence of subsection (2)(d) and the rest of section 1(2) of Article IV, which pertain only to the initiative process, it appears that the single-subject requirement in Article IV, section 1(2)(d), applies to only "law[s] or amendment[s]" proposed by initiative.

Article IV, section 20, offers further support for that conclusion. It provides, in part:

> "*Every Act shall embrace but one subject, and matters properly connected therewith,* which subject shall be expressed in the title." (Emphasis added.)

Because Article IV, section 20, imposes a single-subject requirement upon *legislative* enactments, it is logical that, as to *statutory* enactments, the single-subject requirement in Article IV, section 1(2)(d), applies to only laws enacted *by initiative*. It follows, as a textual matter, that the single-subject requirement in Article IV, section 1(2)(d), applies to only constitutional amendments adopted by initiative, rather than those adopted pursuant to legislative proposal under Article XVII, section 1.

We turn to the historical circumstances surrounding the development of the single-subject requirement of Article IV, section 1(2)(d). At the outset, we note that the original Oregon Constitution contained no single-subject requirement for proposed amendments. It did, however, contain the single-subject requirement for legislation in Article IV, section 20. Or Const, Art IV, § 20 (1859).

As explained earlier, in 1902, the people adopted a legislatively proposed amendment to Article IV, section 1, of the Oregon Constitution, thereby reserving to themselves the right to initiate laws and constitutional amendments. Or Const, Art IV, § 1 (1902). The new provision did not define the word "amendment" and did not contain a single-subject requirement. The voters' pamphlet for the 1902 election did not contain any statements concerning the provision, and we have found no other sources from that time period that inform us of the voters' intent concerning the word "amendments" as it was used in the new provision. *See LaGrande/Astoria v. PERB*, 284 Or 173, 184 n 8, 586 P2d 765 (1978) (demonstrating that proponents' statements can be indicative of the meaning of the measure when those statements are circulated to the public at large).

In 1968, the voters approved a legislatively proposed amendment that repealed the extant version of Article IV, section 1, and adopted a new version in its place. The new

version made changes to the initiative and referendum process, one of which was the imposition of a single-subject requirement upon proposed laws and amendments. Or Const, Art IV, § 1(2)(d) (1968); *see also* 327 Or at 270 (setting out text of Article IV, section 1(2)(d)). As noted earlier, it appears from its text and context that that single-subject requirement pertains to only *initiated* constitutional amendments, as well as to initiated laws, rather than to legislatively proposed amendments.

The explanatory statement contained in the 1968 voters' pamphlet stated that one purpose of the 1968 amendment was to "clean-up" parts of the constitution, by repealing obsolete provisions and by combining the various initiative and referendum powers held by the people into one part of the constitution. *See Official Voters' Pamphlet, Primary Election*, May 28, 1968, 8 (setting out purposes of the 1968 amendment). A manifest inference from that history is that one element of the "clean-up" was to ensure that laws passed by the people pursuant to their initiative power were subject to essentially the same single-subject requirement as enactments of the legislature. In so doing, however, the new version of Article IV, section 1, also imposed that requirement upon initiated constitutional amendments.

In summary, then, the Oregon Constitution originally contained a single-subject requirement for legislation, but not for constitutional amendments. Although the people acquired the initiative power in 1902, it was not until 1968 that Article IV, section 1, imposed a single-subject limitation upon the people's ability to amend the constitution. However, the Oregon Constitution never has imposed a single-subject requirement upon the legislature's ability to propose amendments to the constitution.

We now turn to the case law interpreting the single-subject requirement of Article IV, section 1(2)(d), which is well-settled for our purposes here. In *OEA v. Phillips*, 302 Or 87, 100, 727 P2d 602 (1986), for example, this court concluded that the single-subject requirement in Article IV, section 1(2)(d), is the same as the single-subject requirement for legislation contained in Article IV, section 20. The court noted that the central purpose of the single-subject requirement

was to prevent the practice of inserting two or more unrelated provisions into a single bill—commonly known as "logrolling"—so that legislators favoring one provision would be compelled to vote for the bill despite their opposition to the other provisions. If log-rolling were not prohibited, then several provisions could become law that, standing alone, could not have succeeded on their own merits. *Id.* at 95.

More recently, in *State ex rel Caleb v. Beesley*, 326 Or 83, 89-91, 949 P2d 724 (1997), this court reviewed the case law interpreting both section 1(2)(d) and section 20 of Article IV. In that case, which involved legislation enacted by both the legislature and initiative petition, the court concluded:

> "This court's one-subject decisions demonstrate that an enactment that embraces only one subject does not violate the one-subject provisions of Article IV merely by including a wide range of connected matters intended to accomplish the goal of that single subject." *Id.* at 91.

Rather, the court must examine the body of the measure to determine whether the proposed law or amendment contains "a unifying principle logically connecting all provisions in the act [or amendment], such that it can be said that the measure embraces one subject only." *Ibid.* (internal quotation marks and brackets omitted). *See also McIntire v. Forbes*, 322 Or 426, 443-44, 909 P2d 846 (1996) (setting out that approach under Article IV, section 20). The *Caleb* court concluded that, because the provisions of the enactment at issue facilitated a single goal and were pertinent and germane to one overall subject, the enactment did not violate Article IV, section 1(2)(d). 326 Or at 92-93.

Finally, we note that, in this case, the state relies heavily on the discussion in *Baum*, 200 Or at 581, concerning the separate-vote requirement, emphasizing that, under *Baum*, that requirement prohibits submitting an amendment or amendments "on two different subjects." In the state's view, *Baum* stands for the principle that the single-subject and separate-vote requirements impose the *same* restriction upon the people's ability to amend the constitution, and, therefore, if an amendment embraces a single subject under Article IV, section 1(2)(d), as interpreted in *OEA*,

*Caleb*, and other cases, then it must be deemed a single amendment under Article XVII, section 1.

We disagree that *Baum*, which was decided 14 years *before* the single-subject requirement for initiated amendments was added to Article IV, section 1, must be read as the state urges. *Baum* instead suggests that the purpose of the separate-vote requirement is to allow the people to vote upon separate proposed constitutional changes separately. Although the court in *Baum* referred to a hypothetical amendment containing multiple "subjects," the court did not state that, if a proposed amendment contains a single subject, then it also must be deemed to be a single amendment.

### 3. *Summary*

Our review of the specific wording, historical development, and case law surrounding Article XVII, section 1, and Article IV, section 1(2)(d), can be summarized as follows. First, as a textual matter, the separate-vote requirement of Article XVII, section 1, focuses both upon the proposed change to the constitution, as well as the procedural form of submitted amendments. In contrast, the text of the single-subject requirement of Article IV, section 1(2)(d), focuses upon the content of a proposed amendment, by requiring that it embrace only one subject and matters properly connected therewith. Additionally, the single-subject requirement of Article IV, section 1(2)(d), applies to only initiated constitutional amendments, not to legislatively proposed amendments.

As to historical development, the Oregon Constitution, as originally written, contained a single-subject requirement for legislation and a separate-vote requirement for constitutional amendments proposed by the legislature. After the adoption of the initiative and referendum process in 1902, the constitution was changed over time to implement that process, including imposing the separate-vote and single-subject requirements upon the people's ability to propose constitutional amendments by initiative petition. However, there is not, and never has been, a single-subject requirement for amendments proposed by the legislature. Indeed, the separate-vote requirement is the *only* limitation upon the legislature's ability to amend the constitution.

Additionally, the history behind the corresponding provision of the Indiana Constitution of 1851 suggests that a constitutional "amendment" was intended by the framers of that document to address a particular constitutional change, and we have found nothing to suggest that the framers of the Oregon Constitution had a different understanding or intent.

Turning to the case law interpreting the separate-vote requirement of Article XVII, section 1, we note first that the cases are lacking in detailed analysis. However, as a whole, the cases demonstrate that the purpose of the separate-vote requirement is to allow the people to vote upon separate constitutional changes separately.

Finally, the case law interpreting the single-subject requirement of Article IV, section 1(2)(d), demonstrates that that requirement is intended to prohibit "log-rolling." However, when conducting a single-subject inquiry, a court must examine only the content of the proposed amendment, not the effect that the amendment might have upon the existing constitution.

## 4. *Legal Principles*

Having examined the specific wording, historical development, and case law surrounding the separate-vote requirement of Article XVII, section 1, and the single-subject requirement of Article IV, section 1(2)(d), we reach the following conclusions. First, the purposes behind the two requirements are similar: Both serve to ensure that the voters will not be compelled to vote upon multiple "subjects" or multiple constitutional changes in a single vote.

However, it is significant that, from the beginning of statehood, the single-subject and separate-vote requirements have been worded differently. As we have discussed, the single-subject requirement, initially contained only in Article IV, section 20, but now also contained in Article IV, section 1(2)(d), focuses upon the *content* of a proposed law or amendment, by requiring that it embrace only one subject and matters properly connected therewith. *See Caleb*, 326 Or at 91 (under Article IV, section 1(2)(d), the court must examine the measure at issue to determine whether it embraces a single

subject); *McIntire*, 322 Or at 443-44 (setting out the same approach under Article IV, section 20).

The separate-vote requirement, by contrast, focuses upon the form of submission of an amendment, as well as the potential *change* to the existing constitution, by requiring that two or more *constitutional amendments* be voted upon separately. That is, in addition to speaking to the form of submission, the separate-vote requirement addresses the extent to which a proposed amendment would *modify* the existing constitution. That is significantly different from the wording of the single-subject requirement, which focuses in isolation upon only the text of a proposed amendment in requiring that it embrace a single subject.

We also think it significant that the separate-vote requirement applies to *only* constitutional amendments, while the single-subject requirement applies equally to constitutional amendments *and* legislation. It follows, we believe, that the separate-vote requirement of Article XVII, section 1, imposes a *narrower* requirement than does the single-subject requirement of Article IV, section 1(2)(d). Such a reading of the separate-vote requirement makes sense, because the act of amending the *constitution* is significantly different from enacting or amending *legislation*. *See, e.g., McIntire*, 322 Or at 437-38 (stating that the single-subject requirement of Article IV, section 20, "should not be so construed so as to hamper or cripple legislation, or render it oppressive or impracticable, * * * or to multiply the number of laws unnecessarily" (internal quotation marks omitted)). Indeed, because the separate-vote requirement is concerned *only* with a change to the fundamental law, the notion that the people should be able to vote separately upon each separate amendment should come as no surprise. In short, the requirement serves as a safeguard that is fundamental to the concept of a constitution.

■ Finally, we acknowledge that, under *Baum*, 200 Or at 581, the separate-vote requirement encompasses the notion that a single constitutional amendment must contain what the court there referred to as a single "subject[ ]." Indeed, if a proposed amendment contained two different subjects, then it could not be considered a single amendment,

regardless of the existence of the single-subject requirement of Article IV, section 1(2)(d). However, the fact that a proposed amendment containing more than one subject would *violate* both the separate-vote and single-subject requirements does not compel the conclusion that the opposite also is true, *i.e.*, that a proposed amendment that contains only one subject would *not* violate the separate-vote requirement. As we have discussed, the separate-vote requirement imposes a *narrower* restriction than the requirement that a proposed amendment embrace only one subject. It follows, therefore, that a proposed amendment that satisfies the broad standard for embracing a single subject nonetheless may violate the separate-vote requirement. The state's contrary argument is not well taken.

The remaining question is how to determine whether a proposal to amend the Oregon Constitution offends Article XVII, section 1, because it contains two or more amendments. We conclude that the proper inquiry is to determine whether, if adopted, the proposal would make two or more changes to the constitution that are substantive and that are not closely related. If the proposal would effect two or more changes that are substantive and not closely related, the proposal violates the separate-vote requirement of Article XVII, section 1, because it would prevent the voters from expressing their opinions as to each proposed change separately. In some instances, it will be clear from the text of the proposed initiative whether it runs afoul of Article XVII, section 1. In other instances, it will be necessary to examine the implications of the proposal before determining whether it contains two or more amendments.

We turn to Measure 40, to determine whether it contains two or more amendments in violation of Article XVII, section 1.

C. *Application of Legal Principles to Measure 40*

1. *Analysis of Measure 40*

As discussed earlier, by its terms, Measure 40 purports to amend Article I of the Oregon Constitution, by adding a new section to that article that contains procedural rights to which crime victims are entitled in the pretrial,

trial, and post-trial phases of a criminal prosecution or juvenile delinquency proceeding, and by prescribing a construction methodology for sections 9 and 12. Measure 40 does not otherwise *expressly* repeal or modify any existing constitutional provision. As explained below, however, the measure implicitly changes the existing Oregon Constitution in several respects.[8]

      a.  Article I, section 11. Two of the victims' rights set out in section (1) of Measure 40 implicate Article I, section 11, which provides, in part:

> "In all criminal prosecutions, *the accused shall have the right to public trial by an impartial jury* in the county in which the offense shall have been committed; to be heard by himself and counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor; *provided, however, that any accused person, in other than capital cases, and with the consent of the trial judge, may elect to waive trial by jury* and consent to be tried by the judge of the court alone, such election to be in writing; *provided, however, that in the circuit court ten members of the jury may render a verdict of guilty or not guilty, save and except a verdict of guilty of first degree murder, which shall be found only by a unanimous verdict, and not otherwise*[.]" (Emphasis added.)

Section (1)(h) of Measure 40 permits a guilty vote of 11 to 1 in aggravated murder and murder cases, "notwithstanding any other law or provision of [the Oregon] Constitution." Section (1)(h), therefore, changes the unanimous verdict requirement in murder cases, currently set out in Article I, section 11.[9]

---

   [8] On its face, Measure 40 appears to identify two primary purposes. The preamble of the measure provides:

> "This initiative is designed to preserve and protect **crime victims' rights** to justice and due process *and* to ensure the prosecution and conviction of persons who have committed criminal acts. It shall be interpreted to accomplish *these* ends." (Boldface in original; emphasis added.)

We need not determine the significance of that wording, however, because our analysis in the text that follows, concerning the extensive constitutional changes effected by Measure 40 and the lack of relationship between the affected constitutional provisions, answers the question whether the measure contains two or more constitutional amendments.

   [9] The crime of first-degree murder, to which Article I, section 11, refers, was repealed in 1971 and replaced with the crime of murder. Or Laws 1971, ch 743,

Further, section (1)(g) of Measure 40 grants crime victims the right to insist upon a jury trial. That section changes a defendant's ability to waive trial by jury under Article I, section 11, in that it specifies a circumstance—a victim's desire for a jury trial—in which a criminal defendant cannot waive a jury trial.[10]

b.   Article VII (Amended), section 5(1)(a). Section (1)(g) of Measure 40 also specifies certain requirements for juror qualification.[11] Article VII (Amended), section 5(1)(a), provides that "[t]he Legislative Assembly shall provide by law for * * * [s]electing juries and qualifications of jurors." Thus, section (1)(g) of Measure 40 changes Article VII (Amended), section 5(1)(a), because it imposes constitutional limitations upon the legislature's authority to enact laws pertaining to juror qualification in criminal cases.

c.   Article I, section 14. Section (1)(a) of Measure 40 allows pretrial release in certain cases only upon a proper evidentiary showing.[12] Article I, section 14, which requires that crimes other than murder and treason "shall be bailable by sufficient sureties," sets out a standard to determine when

---

§§ 88, 432. The crime of aggravated murder was created in 1977. Or Laws 1977, ch 370.

Plaintiffs contend that, "[t]aken literally, [section (1)(h) of Measure 40] *requires* the jurors to convict. A not guilty verdict, or finding of a lesser offense, is simply not allowed under the measure, according to its plain terms." (Emphasis in original.) We do not read section (1)(h) to reach that absurd result. It is apparent, in our view, that the purpose of that provision is to allow a conviction based upon the votes of 11 jurors for a verdict of guilty, if one juror does not agree.

[10] As noted earlier, Measure 40 also provides that, "as to the conduct and prosecution of [criminal prosecutions and juvenile delinquency] proceedings, it is the district attorney who is authorized to assert the rights conferred on **victims** by this [measure]." Measure 40, § (4) (boldface in original).

[11] Section (1)(g) of Measure 40 grants crime victims the right to a public trial "by a jury selected from registered voters and composed of persons who have not been convicted of a felony or served a felony sentence within the last 15 years."

[12] Section (1)(a) of Measure 40 grants crime victims:

"The right to be reasonably protected from the criminal defendant or the convicted criminal throughout the criminal justice process; decisions as to the pretrial release of the defendant are to be based on the principle of reasonable protection of the victim and the public; *any person arrested for a crime for which the People have set a mandatory minimum sentence shall not be released prior to trial unless a court determines by clear and convincing evidence that the person will not commit new criminal offenses while on release*[.]" (Emphasis added.)

an arrested person may be released before trial. *See generally Priest*, 314 Or at 419 (Article I, section 14, applies to those accused, but not yet convicted, of criminal offenses). Section (1)(a) of Measure 40 changes that standard, by adding new constitutional prerequisites for pretrial release. In other words, section (1)(a) changes the circumstances in which certain criminal defendants otherwise would be entitled to release under Article I, section 14.

d. Article I, sections 9 and 12. Perhaps most notably, section (1)(f) of Measure 40 grants crime victims the right to have "all relevant evidence admissible against the criminal defendant." In addition, section (2) provides that "[t]he rights conferred on **victims** by this [measure] shall be limited only to the extent required by the United States Constitution" (boldface in original) and that "Section 9, Article I and Section 12, Article I of this Constitution shall not be construed more broadly than the United States Constitution."[13]

The parties offer competing interpretations of section (2) of Measure 40, specifically the phrase that limits possible constructions of Article I, sections 9 and 12. Plaintiffs contend that that phrase effectively repeals Article I, sections 9 and 12, as they currently exist, together with judicial interpretations of those provisions, and replaces them with the Fourth and Fifth Amendments to the United States Constitution.[14] Plaintiffs further contend that section (2) effectively

---

[13] Article I, section 9, of the Oregon Constitution, provides:

"No law shall violate the right of the people to be secure in their persons, ises, papers, and effects, against unreasonable search, or seizure; and no 'rant shall issue but upon probable cause, supported by oath, or affirmation, particularly describing the place to be searched, and the person or thing to seized."

A1 I, section 12, of the Oregon Constitution, provides:

"No person shall be put in jeopardy twice for the same offence (sic), nor be mpelled in any criminal prosecution to testify against himself."

The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and ffects, against unreasonable searches and seizures, shall not be violated, and ·o Warrants shall issue, but upon probable cause, supported by Oath or affir- nation, and particularly describing the place to be searched, and the persons or things to be seized."

The Fifth Amendment to the United States Constitution provides, in part:

modifies Article VII (Amended), section 1,[15] because it limits the judiciary's inherent power to interpret the Oregon Constitution, as well as Article III, section 1,[16] because, at the least, it modifies the separation of powers principles set out in that section.

The state responds that section (2) of Measure 40 merely clarifies the scope of a crime victim's right under section (1)(f) of the measure to have all relevant evidence admissible against a criminal defendant, by instructing courts that they may suppress evidence obtained in violation of the Oregon Constitution only if the United States Constitution would require suppression. Stated differently, in the state's view, section (2) changes the *remedy* to be afforded for a violation of certain rights embodied in the Oregon Constitution, but does not change the nature of the state constitutional *rights* themselves.

We need not resolve the parties' competing contentions concerning the precise intended effect of section (2) of Measure 40. Even under the state's more limited reading of section (2), that section, particularly when read in conjunction with section (1)(f) of Measure 40, would have the following effects. First, it would create a constitutional limitation upon the remedy to be afforded for violations of Article I, sections 9 and 12, by requiring that evidence be suppressed only

---

"No person shall * * * be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself[.]"

The Fourth and Fifth Amendments are made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See Mapp v. Ohio*, 367 US 643, 655, 81 S Ct 1684, 6 L Ed 2d 1081 (1961) (Fourth Amendment); *Benton v. Maryland*, 395 US 784, 794, 89 S Ct 2056, 23 L Ed 2d 707 (1969) (double jeopardy clause of Fifth Amendment); *Boykin v. Alabama*, 395 US 238, 243, 89 S Ct 1709, 23 L Ed 2d 274 (1969) (self-incrimination clause of Fifth Amendment).

[15] Article VII (Amended), section 1, of the Oregon Constitution, provides:

"The judicial power of the state shall be vested in one supreme court and in such other courts as may from time to time be created by law."

[16] Article III, section 1, of the Oregon Constitution, provides:

"The powers of the Government shall be divided into three seperate (sic) departments, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."

if the Fourth or Fifth Amendments to the United States Constitution require suppression. Second, and perhaps more significantly, section (2) would change the nature of the rights currently afforded under Article I, section 9, because the protections afforded by Article I, section 9, *include* the right to have evidence excluded if it is obtained in violation of the right to be free from unreasonable searches and seizures. *See State ex rel Juv. Dept. v. Rogers*, 314 Or 114, 119, 836 P2d 127 (1992) (the exclusion of evidence under Article I, section 9, is "based on the personal right to be free from an unlawful search and seizure," in contrast to deterring police misconduct (internal quotation marks omitted)); *State v. Davis*, 313 Or 246, 253-54, 834 P2d 1008 (1992) ("If th[e] constitutional right [under Article I, section 9] to be secure against impermissible government conduct is to be effective, it must mean that the government cannot obtain a criminal conviction through the use of evidence obtained in violation of a defendant's rights under that provision. * * * Individual rights so protected are vindicated through the sanction of suppression of evidence." (Internal quotation marks omitted.)).

    e. Summary. Measure 40 adds a number of crime victims' rights to Article I of the Oregon Constitution and also changes the constitution in the following respects: (1) a criminal defendant's ability to waive a jury trial under Article I, section 11, is limited by the victim's new and competing right to a jury trial; (2) a unanimous verdict no longer is required in aggravated murder and murder cases under Article I, section 11; (3) the legislature's ability to enact laws pertaining to juror qualifications in criminal cases under Article VII (Amended), section 5(1)(a), is limited by new constitutional requirements; (4) a criminal defendant's right to pretrial release under Article I, section 14, is limited by new constitutional requirements; and (5) at the least, the constitutional remedy for violation of the rights set out in Article I, sections 9 and 12, is limited to the remedies available under the Fourth and Fifth Amendments to the United States Constitution, and, consequently, evidence obtained in violation of those rights can be suppressed only if the United States Constitution requires suppression.[17]

---

[17] Plaintiffs contend that "[o]ther potentially-affected sections of the Bill of Rights include [section] 15 (reformation), [section] 19 (imprisonment for debt),

### 2. *Measure 40 contains two or more amendments to the Oregon Constitution*

As can be seen, in addition to adding a number of crime victims' rights to Article I, Measure 40 changes five existing sections of the Oregon Constitution (Article I, sections 9, 11, 12, and 14, and Article VII (Amended), section 5(1)(a)), encompassing six separate, individual rights (pertaining to search and seizure, unanimous jury verdicts, waiver of jury trial, former jeopardy, self-incrimination, and bail), in addition to limiting the legislature's ability to establish juror qualifications in criminal cases. Those multiple constitutional changes effected by Measure 40 are more than sufficient to meet that part of the test for "two or more amendments," discussed earlier, that inquires whether the measure at issue makes "two or more changes to the constitution." *See* 327 Or at 277 (stating test). It is equally clear, we think, that the changes effected by Measure 40 are substantive. The remaining issue, then, is whether those changes are "not closely related."

Many of the constitutional provisions affected by Measure 40 are related in the sense that they pertain to constitutional rights that might be implicated during a criminal investigation or prosecution. However, not all—such as the requirement that the jury pool in criminal cases be drawn from registered voters—share even that relationship. Further, even those provisions that are related in the sense described are not related closely enough to satisfy the separate-vote requirement of Article XVII, section 1. For example, the right of all people to be free from unreasonable searches and seizures under Article I, section 9, has virtually nothing to do with the right of the criminally accused to have a unanimous verdict rendered in a murder case under Article I, section 11. The two provisions involve separate constitutional rights, granted to different groups of persons. Similarly, the right of the criminally accused to bail by sufficient sureties under Article I, section 14, bears no relation to legislation concerning the qualification of jurors in criminal

_____

[section] 23 (habeas corpus), [section] 40 (penalty for aggravated murder), and [section] 41 (work for inmates)." Plaintiffs do not elaborate on those claims, and we do not address them.

cases under Article VII (Amended), section 5(1)(a). Those examples alone are sufficient to demonstrate that Measure 40 contains "two or more amendments" to the Oregon Constitution. Accordingly, we conclude that the measure was not adopted in compliance with Article XVII, section 1.

We emphasize that we express no view regarding the merits of the changes proposed by Measure 40. Indeed, this court's case law makes clear that Article IV, section 1, grants the people the power to change the Oregon Constitution as they so desire, including modifying or repealing a provision of the Bill of Rights, so long as the proposed change or changes comply with the constitutional requirements for amending the constitution. *See Ex Parte Kerby.*, 103 Or 612, 616-17, 205 P 279 (1922) (through their initiative power, the people can adopt a constitutional amendment that expressly or implicitly repeals an existing constitutional provision, including a provision of the Bill of Rights); *Boyd v. Olcott et al.*, 102 Or 327, 358-59, 202 P 431 (1921) ("The Constitution prescribes the method by which it may be amended, and the procedure so prescribed is the measure of the power to amend."). Our holding here simply is that Measure 40 contains two or more constitutional amendments that must be voted upon separately under Article XVII, section 1.[18]

D. *Measure 40 is Invalid in its Entirety*

██ It is a long-standing principle of law that a proposed constitutional amendment must be adopted in compliance with the procedures set forth in the Oregon Constitution:

"The provisions of the constitution for its own amendment are mandatory, and must be strictly observed. *A failure in this respect will be fatal to a proposed amendment, notwithstanding it may have been submitted to and ratified and approved by the people.* The constitutional provisions are as binding upon the people as upon the legislative assembly, and the people cannot give legal effect to an amendment which was submitted in disregard of the limitations imposed by the constitution * * *. * * * *If* * * * *an attempt is*

---

[18] Because we agree with plaintiffs that Measure 40 contains two or more amendments under Article XVII, section 1, we do not address plaintiffs' additional contentions that the measure embraces more than one subject or that it revises, rather than amends, the Oregon Constitution.

*made to amend an existing constitution, its every require-
ment regarding its own amendment must be substantially
observed, and the omission of any one will be fatal to the
amendment.* The constitution is the supreme law of the
land, binding upon all, and can no more be disregarded in
the manner of its own amendment than in any other
respect. As long as it remains, its provisions must be
observed."

*Kadderly v. Portland,* 44 Or 118, 135-36, 74 P 710 (1903), *on
rehearing* 75 P 222 (1904) (emphasis added). *See also Boyd,*
102 Or at 359 ("The provisions of the Constitution for its own
amendment are mandatory and binding not only upon the
legislative assembly but also upon all the people as well; and,
consequently, a failure to observe the mandates of the Con-
stitution is fatal to a proposed amendment, even though the
electors have with practical unanimity voted for it."). Accord-
ingly, because Measure 40 was not adopted in compliance
with Article XVII, section 1, we hold that it is void in its
entirety.[19]

## IV.   REMAINING ISSUES

We turn to the remaining issues in this case, raised
on the state's cross-appeal.

### A.   *Injunction*

As noted earlier, after concluding that section (2) of
Measure 40 revised the constitution, the circuit court entered
an injunction against "[d]efendant Kitzhaber and his subor-
dinates and the State and its subdivisions," enjoining them

---

[19] Because this case concerns the procedural requirements for amending or
revising the constitution, the question of severability, which was raised as an issue
below in relation to plaintiffs' "revision" challenge to Measure 40, is not an issue
here. Severability relates to a substantive challenge, based upon a superior source
of law, to certain provisions of a law or amendment that has been properly enacted
or adopted. *Hart v. Paulus,* 296 Or 352, 361, 676 P2d 1384 (1984); *see also Oregon
State Police Officers' Assn. v. State of Oregon,* 323 Or 356, 380, 918 P2d 765 (1996)
(in concluding that a constitutional amendment, adopted by initiative petition, vio-
lated the Contracts Clause of the United States Constitution, the court applied
principles of severability and concluded that no section could be saved). In contrast,
this case concerns "the legality of the enactment [or adoption] process itself." *Hart,*
296 Or at 361. *See also Lane Transit District v. Lane County,* 327 Or 161, 169-70,
957 P2d 1217 (1998) (stating that the severability clause in the measure at issue "is
(and would have to be) aimed at judicial construction of the measure after (and if)
* * * it is adopted").

"from enforcing or attempting to enforce" section (2). Also as noted, the Court of Appeals stayed the enforcement of the injunction, pending the outcome on appeal. *Armatta*, 149 Or App 498.

The state contends that, regardless of our determination whether Measure 40 is invalid, "permanent injunctive relief is not appropriate against the state or its agencies." Plaintiffs respond that any error that might have occurred in the issuance of the injunction is moot, either because the Court of Appeals already "vacated" the injunction or, if Measure 40 is declared invalid in its entirety, an injunction no longer is necessary.

We agree with plaintiffs' latter point: An injunction is not necessary in light of our determination that Measure 40 was not adopted in compliance with Article XVII, section 1, of the Oregon Constitution. Consequently, we need not address the propriety of the circuit court's order enjoining defendants Kitzhaber and the State of Oregon from enforcing section (2) of Measure 40.

B.   *Attorney Fees*

■    Finally, the state assigns error to the circuit court's decision to award plaintiffs attorney fees in the amount of $23,667.50.[20] In the state's view, plaintiffs have individualized interests in the outcome of this case that make attorney fees inappropriate under *Deras v. Myers*, 272 Or 47, 65-67, 535 P2d 541 (1975), and *Vannatta v. Keisling*, 324 Or 514, 548-49, 931 P2d 770 (1997). The state further disputes whether, in filing this action, plaintiffs sought to benefit the rights of all Oregonians. Plaintiffs respond that they have no individualized interests at stake in this litigation and that their goal of having Measure 40 declared unconstitutional serves to benefit all Oregonians.

In *Deras*, the plaintiff, a former candidate for state representative, sought a declaratory judgment that certain laws that restricted campaign spending were unconstitutional. 272 Or at 49-50.[21] This court agreed, holding that the

---

[20] The state does not dispute the amount of attorney fees awarded; rather, it challenges only the decision to *award* attorney fees.

[21] The *Deras* opinion erroneously stated that the plaintiff was a candidate at the time. That was inaccurate. In fact, the plaintiff in *Deras* was a *former* candidate for public office, but was not a candidate for anything at the time of the opinion.

laws at issue were invalid. The court then addressed the trial court's decision to deny the plaintiff attorney fees, stating:

"[A]s a general rule[,] American courts will not award attorney's fees to the prevailing party absent authorization of statute or contract, * * * [however,] courts of equity have the inherent power to award attorney's fees. This power frequently has been exercised in cases where the plaintiff brings suit in a representative capacity and succeeds in protecting the rights of others as much as his own." *Id.* at 65-66.

The court concluded that, because the plaintiff's action was in "the interest of the public in preservation of the individual liberties guaranteed against governmental infringement of the constitution," he should be awarded reasonable attorney fees. *Id.* at 66-67.

Since issuing its decision in *Deras*, this court has not allowed another attorney fee award under the principles set out in that case. In denying such requests, the court has clarified that there are a number of prerequisites that must be fulfilled before such an award is appropriate. First, the proceeding must be one in equity. *See, e.g., Dennehy v. Dept. of Rev.*, 308 Or 423, 428, 781 P2d 346 (1989) (denying attorney fees, in part, because the action was not one in equity); *Cook v. Employment Division*, 293 Or 398, 401, 649 P2d 594 (1982) (same). Second, the party requesting attorney fees must be the prevailing party. *See Gugler v. Baker Co. Ed. Serv. Dist. (Gugler III)*, 305 Or 570, 574, 754 P2d 903 (1988) (denying fees because the plaintiffs had not prevailed in their action); *Dennehy v. City of Gresham*, 314 Or 600, 604, 841 P2d 633 (1992) (same); *see also Lewis v. Dept. of Rev.*, 294 Or 139, 143-44, 653 P2d 1265 (1982) (denying fees, in part, because the court did not grant the relief sought by the plaintiff). Finally, in filing the action, the party requesting attorney fees must have been seeking to "vindicat[e] an important constitutional right applying to all citizens without any gain peculiar to himself," *Dennehy v. City of Gresham*, 314 Or at 602, as opposed to vindicating "individualized and different interests," *Vannatta*, 324 Or at 549, or "any pecuniary or other special interest of his own aside from that shared with the public at large." *Dennehy v. Dept. of Rev.*, 308 Or at 427. *See also Samuel v. Frohnmayer*, 308 Or 362, 370, 779 P2d 1028

(1989) (the plaintiff in *Deras* was seeking no "monetary or other gain peculiar to himself").

This case involves a proceeding in equity, and, in light of our conclusion that Measure 40 is invalid, plaintiffs are the prevailing parties. Rather, in challenging the award of attorney fees, the state first contends that plaintiffs have the same sort of individualized interests in the outcome of this litigation that were identified in *Vannatta*. Looking to plaintiffs' statement of standing in their complaint, the state specifically notes that: (1) plaintiff Robson, Benton County Sheriff, alleged that Measure 40 would remove his discretion to assign inmates to alternative programs; (2) plaintiff Eyerman alleged her concern that, under Measure 40, law enforcement officials may trespass upon her property; and (3) all seven plaintiffs alleged their concerns about the effect that Measure 40 would have on their taxes.

We conclude that the factors cited by the state concerning plaintiffs' interests in this case are not the type of "individualized," "peculiar," or "pecuniary" interests that preclude an attorney fee award. Unlike the plaintiffs in other cases in which this court denied attorney fees for that reason, none of the plaintiffs in this case stands to gain any particular benefit from a declaration that Measure 40 is invalid, other than the benefit that they share with all other citizens in having the Oregon Constitution correctly construed. *Compare Vannatta*, 324 Or at 549 (plaintiffs challenging campaign finance laws, who included a potential candidate for state office and a political action committee, had "individualized and different interests" in the litigation that they sought to vindicate); *Dennehy v. City of Gresham*, 314 Or at 604 (taxpayer who challenged a user charge had a peculiar interest in the litigation).

The state next emphasizes that, in awarding attorney fees to plaintiffs, the circuit court found that "the relief [plaintiffs] sought and obtained benefits all Oregon residents equally against governmental searches."[22] In the state's view,

---

[22] On appeal, plaintiffs reiterate that argument to support the attorney fees award, contending that the judgment below "saves everyone, not just [plaintiffs], from loss of the state constitutional protections against self-incrimination, double jeopardy, and unreasonable governmental searches and seizures."

that reasoning cannot provide the basis for awarding attorney fees to plaintiffs, because the voters, through their initiative power, are free to change the nature of the state constitutional protections relating to search and seizure.

We agree that the crux of this action is not *whether* the Oregon Constitution *should* contain its own, independent protections against governmental intrusions in the form of unreasonable searches and seizures, compelled self-incrimination, or placement of a person in jeopardy twice for the same offense. As we have made clear in this opinion, the people of Oregon have the power to change their constitution as they so desire, provided that the proposed change is adopted in compliance with the requirements for amending the constitution, as set out in Article XVII, section 1, and Article IV, section 1.

However, in filing this action, plaintiffs primarily sought to enforce the provisions of the Oregon Constitution that relate to amendment and revision of that document, and ultimately prevailed on their claim that Measure 40 was not passed in compliance with the separate-vote requirement of Article XVII, section 1. Plaintiffs, therefore, sought to benefit all Oregonians, because they sought to defend the integrity of the amendment and initiative processes. That is the type of public benefit that, in our view, makes an award of attorney fees appropriate. *See Gilbert v. Hoisting & Port. Engrs.*, 237 Or 130, 138, 384 P2d 136 (1963), *modified* 390 P2d 320 (1964) (awarding attorney fees to union members who sought to correct abuses of the democratic process in their union, because "[t]he preservation of the democratic process in the functioning of unions is a matter of primary concern, not only to union members but to the public as well"). Accordingly, we hold that the circuit court's award of attorney fees was proper.

## V. CONCLUSION

Expressing no view on the merits of the constitutional changes effected by Measure 40, we conclude that the measure contains two or more amendments, in violation of Article XVII, section 1, of the Oregon Constitution. Because Measure 40 was not passed in compliance with Article XVII, section 1, it is invalid in its entirety. We further conclude that

injunctive relief is not necessary in this case. Finally, we affirm the award of attorney fees to plaintiffs.

The judgment of the circuit court is affirmed in part and reversed in part.

# APPENDIX

Ballot Measure 40 (1996) provides:

## "AMENDS CONSTITUTION

"**PREAMBLE:** This initiative is designed to preserve and protect **crime victims' rights** to justice and due process and to ensure the prosecution and conviction of persons who have committed criminal acts. It shall be interpreted to accomplish these ends.

"**This section is added to Article I of the Oregon Constitution:**

"(1) To ensure **crime victims** a meaningful role in the criminal and juvenile justice system, to accord them due dignity and respect, and to ensure that persons who violate laws for the punishment of crime are apprehended, convicted and punished, the following rights are hereby granted to **victims** in all prosecutions for crimes and juvenile delinquency proceedings:

"(a) The right to be reasonably protected from the criminal defendant or the convicted criminal throughout the criminal justice process; decisions as to the pretrial release of the defendant are to be based on the principle of reasonable protection of the victim and the public; any person arrested for a crime for which the People have set a mandatory minimum sentence shall not be released prior to trial unless a court determines by clear and convincing evidence that the person will not commit new criminal offenses while on release;

"(b) The right to be present at, to be heard at, and, upon specific request, to be informed in advance of any critical stage of the proceedings where the criminal defendant is present, including trial;

"(c) The right, upon request, to information about the conviction, sentence, imprisonment, criminal history and future release from physical custody of the criminal defendant or convicted criminal;

"(d) The right to refuse an interview, deposition or other discovery request by the defendant, the defendant's attorney, or other person acting on behalf of the defendant;

"(e)  The right to receive prompt restitution from the person or persons convicted of the criminal conduct that caused the victim's loss or injury;

"(f)  The right to have all relevant evidence admissible against the criminal defendant;

"(g)  The right, in a criminal prosecution, to a public trial without delay by a jury selected from registered voters and composed of persons who have not been convicted of a felony or served a felony sentence within the last 15 years, except that no court shall hold that a jury is required in juvenile court delinquency proceedings;

"(h)  The right to have eleven members of the jury render a verdict of guilty of aggravated murder or murder, notwithstanding any other law or provision of this Constitution;

"(i)  The right to have a copy of a transcript of any court proceeding, if one is otherwise prepared;

"(j)  The right that no law shall permit a sentence imposed by a judge in open court to be set aside or otherwise not carried out except through the reprieve, commutation, and pardon power of the governor or pursuant to appellate or post-conviction relief;

"(k)  The right that no law shall limit the court's authority to sentence a criminal defendant consecutively for crimes against different victims;

"(l)  The right to have all charges against a criminal defendant tried in a single trial; subject to rules regarding venue;

"(m)  The right to be consulted, upon request, regarding plea negotiations involving any violent felony; and

"(n)  The right to be informed of these rights as soon as reasonably practicable.

"(2)  The rights conferred on **victims** by this section shall be limited only to the extent required by the United States Constitution; Section 9, Article I and Section 12, Article I of this Constitution shall not be construed more broadly than the United States Constitution and in criminal cases involving a **victim,** the validity of prior convictions shall not be litigated except to the extent required by the United States Constitution.

"(3) This section shall not reduce a criminal defendant's rights under the United States Constitution, reduce any existing right of the press, or affect any existing statutory rule relating to privilege or hearsay.

"(4) As to the decision to initiate criminal or juvenile proceedings and as to the conduct and prosection of such proceedings, it is the district attorney who is authorized to assert the rights conferred on **victims** by this section.

"(5) '**Victim**' means persons who have suffered financial, social, psychological or physical harm as a result of a crime or juvenile offense, and includes, in the case of a homicide, a member of the immediate family of the decedent, and, in the case of a minor **victim**, the legal guardian of the minor. In no event shall the criminal defendant be considered a victim. In criminal cases not involving a **victim**, the people of the State of Oregon, represented by the State of Oregon, shall have the same rights conferred by this section on **victims**.

"(6) 'Relevant evidence' means evidence having any tendency to prove the charge against the criminal defendant or establish the proper sentence for the criminal defendant.

"(7) In criminal cases prosecuted by a municipality, 'district attorney' as used in this section includes the city attorney.

"(8) 'Criminal defendant' includes juvenile offenders in juvenile court delinquency proceedings.

"(9) This section creates no new civil liabilities." (Boldface in original.)

**DURHAM, J.,** concurring.

I concur in the majority's disposition of the trial court's judgment, and write separately to explain the basis for my concurrence with the award of attorney fees.

In *Gilbert v. Hoisting and Port. Engrs.*, 237 Or 130, 138, 384 P2d 136, 390 P2d 320 (1964), and *Deras v. Myers*, 272 Or 47, 66-67, 535 P2d 541 (1975), this court relied on the inherent power that courts of equity have used throughout their history to award attorney fees "in cases where the plaintiff brings suit in a representative capacity and succeeds in protecting the rights of others as much as his own." *Deras*, 272 Or at 66. Those cases support the principle that, if a plaintiff brings an action that seeks relief from official misconduct or errors that violate the plaintiff's important legal rights, and the plaintiff's action succeeds in protecting the rights of others as much as his own, the court, exercising its inherent equitable power, may award attorney fees, in addition to other appropriate relief, to the successful plaintiff. That equitable principle rests on an important assumption about litigation of this kind. That is, if the plaintiff's action actually results in the protection of the legal rights of a broader segment of society, and the defendant's choice to defend an unconstitutional law or official action brought about the necessity of incurring the expense of legal services to vindicate the plaintiff's rights in court, it is consistent with judicial notions of fairness to require the defendant, not the plaintiff, to pay the reasonable expenses of bringing the action, including attorney fees.

Congress has enacted fee-shifting legislation governing analogous litigation that vindicates federal constitutional and statutory rights. 42 USC § 1988. Unlike the rule discussed in *Gilbert* and *Deras*, the federal statute does not depend on a showing that the action protected the rights of persons other than the plaintiff or that an award of attorney fees is consistent with equitable principles.

The Oregon Legislature has not enacted a statute that addresses the recovery of prevailing party attorney fees in circumstances similar to those presented in this case. This is a potential subject for state legislation. In the absence of

legislation, Oregon courts will continue to administer judge-made rules on this subject that reflect the equitable principles that underlie *Gilbert* and *Deras*.

Some of those judge-made rules bear closer scrutiny to insure that they, in fact, accomplish equity. For example, in *Samuel v. Frohnmayer*, 308 Or 362, 779 P2d 1028 (1989), the issue was:

> "whether an award of attorney fees to the winning party for expenses incurred in pursuing the declaratory judgment may be 'proper' further relief under the statute, when only the statute itself is relied upon as the source of the court's authority to make the award." 308 Or at 364.

The court concluded that a specific statute, ORS 182.090, not a more general statute, ORS 28.080, or *Deras*, governed the award of attorney fees in the circumstances, and that the plaintiff had not pleaded or proven that he was entitled to an award of attorney fees under the governing statute. In discussing why *Deras* was not controlling, the court said:

> "The award [in *Deras*] was based on the inherent power of a court sitting in equity as well as the fact that the citizen had vindicated a right applying equally to all citizens, *without any monetary or other gain peculiar to himself.* [*Deras*,] 272 Or at 65-66. *See also Cook v. Employment Division*, 293 Or 398, 401, 649 P2d 594 (1982). Samuel's position is not analogous. He is not a volunteer (at least in the *Deras* sense); he is vindicating only an interest of his own. Even if this case were one in equity, it would not be an appropriate one in which to make an award based on *Deras v. Myers*." 308 Or at 370 (emphasis added).

That passage in *Samuel* is noteworthy in several respects. First, the details of the court's description of *Deras* are entirely *dictum*. The court held only that a statute, ORS 182.090, was the sole source of authority to award attorney fees in the circumstances and that the plaintiff was ineligible under that statute. The court had no reason to discuss whether *Deras* stated a correct rule of law or to alter the rule stated in *Deras*.

Second, the *Samuel* court's summary of *Deras* is not accurate. The passage emphasized in the quotation stated above appears in no form in *Deras*. If the *Samuel* court meant

to suggest that being a "volunteer" under *Deras* meant that the plaintiff cannot seek any monetary or other relief peculiar to himself, that reading of *Deras* is incorrect. The passage in *Deras* that the *Samuel* court cited states:

"[Plaintiff] correctly points out that courts of equity have the inherent power to award attorney's fees. This power frequently has been exercised in cases where the plaintiff brings suit in a representative capacity and succeeds in protecting the rights of others as much as his own. * * *

"It is beyond dispute that the interest of the public in preservation of the individual liberties guaranteed against governmental infringement of the constitution is even stronger than that present in *Gilbert*. Correspondingly, plaintiff in this case, at least as much as the plaintiffs in *Gilbert*, should not be required to bear the entire cost of this litigation the benefits of which flow equally to all members of the public." 272 Or at 66.

That discussion demonstrates that *Deras* does not support the statement in *Samuel* that the plaintiff must seek to vindicate the rights of all citizens without any monetary or other gain peculiar to himself.

Neither is that statement supported by the other case authority cited in *Samuel*. *Cook v. Employment Division* states only that, in deciding *Deras* and *Gilbert*, the court relied on the inherent power of a court of equity. *Cook*, 293 Or at 401. *Cook* does not mention a requirement that the plaintiff seek no monetary or other gain peculiar to himself, and does not suggest that *Deras* or *Gilbert* recognized such a requirement.

Aside from the absence of any legal support for such a purported requirement, this court has never explained why a court of equity would impose such a precondition to the recovery of attorney fees. The defendants in *Gilbert* and *Deras* enforced unconstitutional or unlawful legal schemes that harmed the plaintiffs' rights. If those defendants, acting pursuant to the same unlawful schemes, had committed even more serious transgressions against the plaintiffs, such as, for example, depriving them of their property, that fact would enhance, not diminish, the plaintiffs' equities in seeking attorney fees under *Gilbert* and *Deras*. In my view, equitable

principles, not the *dictum* in *Samuel*, determines a prevailing party's entitlement to attorney fees under *Gilbert* and *Deras* A party never loses the right to any form of equitable remedy merely by seeking complete relief in the complaint. Neither should a request for complete relief, including relief that is peculiar to the requesting party, disqualify the party from an award of attorney fees under *Gilbert* and *Deras*. Such an impediment finds no support in traditional equitable principles.

Unfortunately, three later cases have repeated without analysis the *dictum* in *Samuel* suggesting that *Deras* required the prevailing plaintiff to seek vindication of important constitutional rights without any gain peculiar to himself. *Vannatta v. Keisling*, 324 Or 514, 548-49, 931 P2d 770 (1997);[1] *Dennehy v. City of Gresham*, 314 Or 600, 602, 841 P2d 633 (1992); *Dennehy v. Dept. of Rev.*, 308 Or 423, 427-28, 781 P2d 346 (1989). That erroneous description of the law derived from *Gilbert* and *Deras* does not acquire legitimacy by reason of its bare repetition in those cases.

The court, at its earliest opportunity, should correct its erroneous descriptions of criteria for a recovery of attorney fees under *Gilbert* and *Deras*. The error probably affects the relief sought in many cases that never reach this court. For example, parties may forego requesting relief to which they are entitled simply to avoid the argument that they are disqualified from seeking attorney fees because they have sought to vindicate an individual interest that is different from the public's potential interest in the litigation. Parties have no ability to recast their claims so that they can recover

---

[1] *Vannatta* may be read to have introduced yet another erroneous impediment to an attorney fee award in cases controlled by *Gilbert* and *Deras*. In denying an award of attorney fees, the court in *Vannatta* said: "The overall benefit to the public is only an ancillary result in this case." 324 Or at 549. Nothing in *Gilbert* or *Deras* suggests that a prevailing party who otherwise qualifies for an award of attorney fees will lose that entitlement if the benefit to the public is merely an "ancillary" result of the litigation. The plaintiffs in *Gilbert* and *Deras* sought to vindicate *their own* legal interests in bringing their actions. The benefit to the broader public from their success was only an ancillary result of the litigation. Despite its ancillary character, that public benefit was sufficient to justify an award of attorney fees to the successful plaintiffs. I do not read *Vannatta* to disqualify an otherwise eligible party from recovering attorney fees under *Gilbert* and *Deras* merely because that party aims primarily to protect personal, rather than the public's, rights from disparagement.

all the relief to which they are entitled individually *and* still recover the attorney fees to which they are entitled under *Gilbert* and *Deras*. The unfairness of forcing a litigant to make that sort of election is obvious. Because that error is rooted in *dictum* in an opinion of this court, it is less likely that the legislature will adopt a statute that corrects it. Accordingly, the court must act.

I join the majority's award of attorney fees here because, in accordance with the principle of *Gilbert* and *Deras*, we must acknowledge that plaintiffs' litigation has succeeded in protecting the constitutional rights of other citizens as much as their own. The determination of plaintiffs' entitlement to attorney fees in this context is controlled by the application of traditional equitable principles. In describing their standing to bring this action, plaintiffs identify several diverse legal interests that they do not share with the general public. The majority concludes that those interests are not sufficient to disqualify plaintiffs from recovering their attorney fees.

I would apply a somewhat different analysis. In my view, although plaintiffs' interests in bringing this litigation do not mirror the interests of the general public in a favorable outcome, plaintiffs do share with the general public an interest in protecting the Oregon Constitution from unlawful amendment. Plaintiffs' litigation has succeeded in protecting the public's interest as much as their own. Moreover, none of plaintiffs' diverse interests cited by defendants invokes any equitable principle that would render an award of attorney fees unfair or inequitable. Accordingly, in reliance on *Gilbert* and *Deras*, I join the majority's award of prevailing party attorney fees to plaintiffs in this case.

I concur.